MAGOON, Executrix, Appellant, vs. REBER and another, Respondents.

*March 18 — April 8, 1890.*

*Promissory notes: Duress: Evidence.*

1. Promissory notes executed under duress are void, even though there may have been some consideration to support them.
2. In an action to cancel promissory notes on the ground that they were executed under duress, the evidence (consisting mainly of the testimony of the plaintiff, flatly contradicted by the defendant) is *held* to show that the defendant compelled the plaintiff to sign the notes through constraint of personal violence and threatened bodily injury.

APPEAL from the Circuit Court for *La Fayette* County. The facts are sufficiently stated in the opinion.

*G. O. Barnes,* for the appellant.

For the respondents there was a brief by *Brooks & Blanchard,* and oral argument *T. J. Brooks* and *R. D. Blanchard.*

COLE, C. J. This is an action in equity, brought by the late Henry S. Magoon, to have canceled and declared void three certain promissory notes purporting to have been executed and delivered by him to the defendant *Lydia Magoon* [*alias Lydia Reber*], and a power of attorney thereto attached, authorizing the attorneys therein named to confess judgment for the amount of these notes. The notes and power of attorney are dated December 29, 1885. One is for $3,000, payable two months from date; one for $5,000, payable three months from date; and the third note was for $7,000, payable six .months from date. All the notes are negotiable, and bear interest at ten per cent. from date. The ground upon which it is sought to have the notes and power of attorney adjudged void and canceled is that those instruments were procured from the plaintiff, or were·executed by him, under duress and compulsion exerted over him by the defendant *Richard Magoon, alias Richard H. Reber*. It is also alleged in the complaint that the notes were absolutely without consideration.

The defendants, in their answer, deny all duress and constraint, and allege that the notes and power of attorney were executed by the plaintiff Henry S. freely and voluntarily, in compromise and settlement of certain claims which the defendants *Lydia* and *Richard* had against him.

On the trial the circuit court submitted to a jury the question whether the plaintiff Henry was constrained to sign the notes and power of attorney through fear that, unless he did so, *Richard H.* would do him bodily harm; and the jury answered the question in the negative. The circuit court, without expressing an opinion upon the question of duress, allowed the verdict to stand, and gave judgment for the defendant *Lydia* for the amount due upon the $3,000 note, and costs, and adjudged the other two notes void and to be canceled and delivered to the plaintiff. The judgment does not mention the power of attorney; but,

probably, that falls by the operation of the other parts of the judgment rendered.

It is apparent that the controlling and vital issue in the cause was the question of duress. If the plaintiff was induced to sign the notes and power of attorney through compulsion or constraint of personal violence threatened or impending, or under the influence of such fear of actual violence as overcame his mind and will, so that he did not act freely and voluntarily in executing them, they are void in law, though there might be some consideration to support them; for the principle is elementary that a contract made by a party under compulsion is void, because the consent is of the essence of a contract, and where there is compulsion there is no consent, for that must be voluntary. 1 Pars. Cont. 392; 1 Story, Cont. § 510; 2 Add. Cont. *1181. In this case the plaintiff claims that actual violence was threatened by *Richard H. Reber* to induce him to give the notes and power of attorney. If that fact is satisfactorily established by the testimony, as a matter of course the notes are void. The question is one of fact, depending upon the evidence. The verdict of the jury is that the notes were executed by Henry S. Magoon without any restraint over him being used or any threats of violence being employed. This verdict, however, is not conclusive and binding upon the judgment of the court upon the question submitted, but it may be set aside or disregarded if unsatisfactory and against the weight of evidence; for this is the well-settled practice upon a feigned issue in chancery, that it is mainly advisory or to inform the judgment and conscience of the chancellor. So this court and the trial court may disregard the verdict and determine the question of fact without reference to the findings of the jury, as it thinks the proofs in the case require.

The question whether or not the notes were executed under duress must be mainly determined from the testi-

mony of Henry S. Magoon and the defendant *Richard H.* No other person was present in the room when the transaction took place, and these parties distinctly and flatly contradict each other upon all material points. But we are inclined to give credit to the statements of Henry S. as more consistent and satisfactory, and more in accord with the probabilities and facts attending the transaction. He details fully the circumstances under which he signed the notes and power of attorney, and substantially says that he was in his law-office, alone, in the afternoon of the 29th of December, 1885, when *Richard* came in from the adjoining library room to the desk where he was, and presented a paper for him to sign. It may be observed that the three notes and power of attorney were on the same page of paper. "*Richard* put the paper in my hand. I asked him what it was, and he said in a gruff voice: 'It is a paper for you to sign.' As he said that, I heard something like the cocking of a revolver. I turned, and he was in the act of drawing a pistol out from his right-hand overcoat pocket, and in an instant presented it at me. The next declaration was: 'Sign that paper, damn quick!' As he said this the pistol was close to my head. I told him I wanted to read it. He answered that it was not necessary for me to read it. I told him I would go and get my specs, which were in the front office, on the counter. He said I didn't need my specs. The next declaration was, I would call O'Brien as a witness; that O'Brien would sign as a witness any paper that I would sign. He answered, with an oath, that I didn't need any witness. I next said to him that I didn't have any ink there. The ink was out in the front bank office. He referred to a pencil, and says: 'There is a pencil. You can sign it with that.' I looked, and there was a pencil lying on the desk. With an oath, he demanded that I should sign that paper with that pencil, and with my usual signature. I distinctly saw the pistol.

It was a bright pistol. I saw what I thought was a cylinder behind it. I saw that it was cocked. I saw that his finger was at where the trigger is. With an oath, he demanded that I sign it then. I took the pencil in my hand,—the pistol, part of the time, immediately at my head, and part of the time immediately before my face. I signed the paper two or three times, I don't remember which; but he pointed to the bottom, and said there was another place to sign. I signed that, as well. When signed, he reached, and took the paper in his left hand, holding the revolver in his right. Then, motioning with his pistol, he said, holding the pistol this way (indicating): 'Now, by God! I want $1,000 and mortgages on them notes.' I told him I didn't have any $1,000 in that office. He demanded $1,000. I repeated that I had no $1,000 there. He said: 'You call O'Brien, and require him to hand me $1,000.' At that time I was sitting at the desk. I arose and started to the door,— the door leading into the library room. He said that I should not leave that office until he got the $1,000. Directly afterwards he put the paper in his pocket, opened the door; the pistol still pointing at me. I called O'Brien. A moment intervened. O'Brien did not come. I called again. O'Brien came directly through the bank-office door into about the middle of the library room, and I said to O'Brien: 'This man has compelled me, at the point of a pistol, to sign a paper that I don't know what it is, and now demands that I require you to hand him $1,000.' He muttered something; I don't know what it was. My mind was fixed on O'Brien. A moment intervened, and he said: 'He has got $1,000, and you, Johnny, know it; and I want it.'"

*Richard* gives this testimony a most positive and unqualified contradiction. He denies having any revolver about him when the notes were signed, or using any threats of violence to induce Henry S. to sign them, but says that

Henry S. executed them freely, without any constraint. But his account of the matter seems to us improbable, and passing all belief. It appears from the testimony that but a few days before he had made a proposition to settle all claims he and his mother had against Henry S., or the estate of Richard H. Magoon, deceased, for $6,000. He says that Henry at first accepted the proposition, but afterwards refused to stand by it, or "backed out," as he puts it. Henry then told him to prepare a paper containing what he thought was a reasonable proposition as to what he should be paid for the settlement of these claims, and he would examine it and sign it. This is not the precise language of Richard, but is the meaning and import of what he swore to on these points. That he then, in pursuance of this understanding, drew up these notes and the power of attorney, and took them to Henry at his office, where they were freely executed, if we are to believe *Richard's* testimony. But it is quite improbable that Henry would have freely and voluntarily given notes, all of which became payable in six months, for $15,000, when but three or four days before he had rejected a proposition to pay $6,000 in settlement of these claims. Besides, the notes were signed with a pencil, when ink was near at hand. Business of such importance is not transacted in this hasty manner. Then, the notes were executed and delivered without Henry's taking any receipt, release, or writing showing that the notes were given in settlement of these claims about which there had been so much negotiation and trouble. This version of the matter, as given by *Richard*, is inconsistent and incredible. No sane men do business in that hasty, careless manner. They require such important papers to be signed in ink, and usually have some witness to them, where the business transacted is fair and honest. *Richard* admits that he demanded $1,000 to be paid at once on the notes, but says this was to test the

sincerity and good faith of Henry in the matter. *Richard's* whole account of the transaction shows that the acts of the parties were unusual, unnatural, and improbable. His statements cannot be accepted as true. Besides, Henry S.'s testimony as to the facts of the occurrence is strongly corroborated by O'Brien. When he was called, and first saw the parties, he says Henry S. looked very much excited and trembled somewhat. Henry S. said to him: "This man has compelled me to sign certain papers at the point of a pistol." True, *Richard* at once denounced this statement as a lie; but the impression the whole testimony makes upon our minds is that it was, substantially, the truth.

It was in proof that *Richard* had repeatedly threatened to shoot Henry if he did not get justice in the litigation pending about his and his mother's claims against the estate of Richard H. Magoon, and we have no doubt that it was his settled purpose to coerce and compel Henry to do him justice according to his notions, and that hence he extorted the notes from Henry in pursuance of that intention, and compelled him to sign them through constraint of personal violence and threatened bodily injury. This, of course, avoids the notes, though they might otherwise have some good consideration to support them.

The learned circuit judge, as we have said, declined to pass upon the question of duress, which was the vital and controlling issue in the case; but, because the jury had found that the notes were given voluntarily, he concluded that *Mrs. Reber* had a claim against the maker of the notes sufficiently meritorious in law to support an agreement of compromise, to the extent that the notes could be justly held to be a compromise of her claim. In the view which we are constrained to adopt, we do not feel called upon to go into that question at all. We will merely remark that we should find it difficult to reach any such conclusion from

Davenport vs. The Chicago, Burlington & Northern R. Co.

the evidence in the case. But, no matter. We are fully and entirely clear in our own minds that the notes were given under duress, and must be held void for that reason. A creditor has no right, in law, to coerce or compel his debtor to give him his note for an admitted debt. This proposition will not be denied by any one. So it is immaterial to inquire in this case whether there was a valid consideration to support any of these notes. They are all open to the same objection of having been extorted from the maker under compulsion. Duress is established by the evidence in the most clear and satisfactory manner.

*By the Court.*— That part of the judgment appealed from is reversed, and the cause is remanded with directions to the circuit court to enter judgment canceling the $3,000 note and directing that it be delivered up to the plaintiff in the action.

See note to this case in 45 N. W. Rep. 112.— REP.